## LUKE v. UNITED STATES.
### No. 8027.

Circuit Court of Appeals, Fifth Circuit.
July 27, 1936.

Rehearing Denied Aug. 24, 1936.

712

Roscoe Luke, of Thomasville, Ga., in pro. per., and S. P. Cain, of Cairo, Ga., and Clifford E. Hay, of Thomasville, Ga., for appellant.

T. Hoyt Davis, U. S. Atty., and H. G. Rawls, Asst. U. S. Atty., both of Macon, Ga.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellant was charged in thirteen counts with having devised and having used the United States mails to execute, and attempt to execute, a scheme and artifice to defraud. The scheme charged was inducing persons to become subscribers to the stock of, and to become depositors in, the Citizens Building & Loan Association of Thomasville, Ga., of which appellant was president, upon representations which he knew to be false, and for the purpose of obtaining money to appropriate to his own use. Convicted on ten counts, and sentenced to serve two years in the penitentiary, he appeals.

Ten assignments bring up the claimed errors he relies on for reversal. Of these, three go to the failure to instruct a verdict for defendant. Six go to the admission of evidence. The tenth complains of the overruling of an amended motion for a new trial, setting up newly discovered evidence and misconduct of the jury. Taking this last assignment up first, we find it without substance.

It is settled law that the overruling or granting of a motion for a new trial on the ground of newly discovered evidence or of jury misconduct is within the sound discretion of the trial judge, a discretion not reviewable in the absence of a clear showing that it has been abused, not used. Royal Ins. Co. v. Eastham (C.C.A.) 71 F.(2d) 385. It was for the District Judge, in the exercise of that discretion, to say whether the newly discovered evidence was in law and in fact newly discovered, whether and to what extent it was material, and the possible effect it would have in changing the result on another trial. It was for him, in the exercise of the same discretion, to say whether what was claimed as jury misconduct was misconduct, and particularly whether any prejudice from it was shown

or appeared. His action in overruling this ground of the motion was unexceptionable, for it is neither shown nor claimed that the jury separation complained of in any manner prejudiced appellant, and it further appears that the fact of the separation was known by counsel for appellant while the trial was going on, and no complaint was made of it.

Taking up next assignments 7, 8, and 9, the burden of which is that defendant was not proven guilty and a verdict should have been instructed in his favor, we find them devoid of merit. No one can, we think, read the voluminous record, including especially the testimony of appellant himself, without being convinced that there was abundant evidence to support the finding that when the campaign of solicitation was going on, the company was not only not in the sound and flourishing condition the advertisements gave out, but was in a deplorable condition, and that that condition must have been known to appellant, its president and active manager; indeed, its dominating figure. Its books were being falsely kept, its assets were being squandered by loans without adequate security, and in complete disregard of the rules governing building and loan associations. Indeed, there was ample evidence tending to prove that there was generally going on a management of the company which, devoting its assets to uses for which they were not in law intended, to improper and excessive loans, some for the benefit of appellant, his family and his interests, was wasting and squandering them. Appellant does not deny that it now appears plain that the company was being improperly run, its books falsely kept, its assets misused. He claims that Groover, the secretary-treasurer, was responsible for this spoliation; that he, as president, depositor, and borrower, knew nothing of it. Admitting his responsibility for the campaign of solicitation in which the gilt-edged character of a deposit in and investment with the company was emphasized again and again, his claim was that he believed the statements to be true; that he did not know the assets were padded; that he did not know of any irregularities; that he thought the books balanced; that he did not know of any missing ledger sheets; and that, entirely depending on Groover, he now finds that Groover, intent on feathering his own nest, was despoiling the company, manipulating its books, and making ducks and drakes of its assets. How much he knew of what was going on, to what extent he was a party to it, whether, in short, he was making the company an instrument and means for his own attempted enrichment, was a jury question. There was ample evidence to sustain their verdict that he was.

From July, 1927, until May, 1934, when its affairs were placed in receivership, appellant was president of the association and for the greater part of that time the dominant figure in its affairs. There was of course a perfunctory board of directors, and there were two or three employees. Appellant, however, with the aid of Oscar Groover, the company's secretary and treasurer, employed on a meager salary, managed, conducted, and ran the association's affairs. Groover kept the books and attended to most of the details. Appellant was at the head. A lawyer and business man in Thomasville, he was also, from 1929 to 1932, a judge of the Georgia Court of Appeals, and after 1932 judge of the city court of Thomasville. He was therefore a man of substance and importance in, and, until the failure of the company, had enjoyed the confidence of, his community. No mere nominal depositor in and member of the association, he was a heavy depositor in and borrower from it. His deposit account at one time ran on the books as high as $70,000; with heavy borrowings. When the association closed, his account showed deposits of around $31,676 and loans to him against the deposits of around $38,407, a debit against him of $6,500, without collateral or other security. In addition to these loans to him, the record shows that loans had been made to members of his family, and to persons and businesses with which he was connected. Besides what the books showed to his credit personally, they showed a credit to him at one time, as administrator of the Watson estate, of around $100,000. Thus, in 1932, when the advertisements were being sent out and increasingly as the business neared its end, his interest in the company personally and as trustee was a dominating and overshadowing one. His relation with it was, in short, such that the jury was well warranted in finding, in fact, could hardly have found otherwise, than that he was bound to have known its exact condition, and that its affairs were in a most unsatisfactory shape; or that if he did not know it, he had been grossly negligent and reckless in the discharge of his duties. No money was coming in; no collections were being made. The statement sent out was padded by

showing as assets of the company, assets belonging to others, and instead of, as the advertisements assured, offering a supersafe opportunity for investment, the company offered a practical certainty of losing the greater part of whatever was put in. It is true appellant claims that the condition it was actually in was not known to him; that the books Groover kept were so kept as to show the company solvent; and that he believed them to be correctly kept. It is true that he testified that the grossly insolvent condition of the company in 1934 when it closed, which was revealed when accounts which had been left off the books to make them balance were restored, was the result of the fraudulent manipulations and activities of Groover which had been concealed from him. It is true that by his testimony, as he had a right to do, he put his good faith in issue. It is inescapable, however, that fraudulent manipulation of the company was going on, and that there was a scheme, devised by some one, to defraud going on in connection with it, and the use of the mails for that purpose. The evidence is ample to support the verdict of the jury that the appellant, aided by Groover, was that some one. That the scheme was frustrated and failed because no fish would be taken in the net, no deposits or accounts came in, is unimportant. An instruction to acquit appellant would have been wholly unjustified.

■ Appellant's real reliance is upon his claim that he suffered prejudice from the erroneous admission of evidence. Six assignments deal with these rulings. Three of them, Nos. 5, 6, and 1, touch matters of small importance. The other three, Nos. 2, 3, and 4, go to the admission of ledger and work sheets, in Groover's handwriting, containing greatly significant entries. We dispose first of the first three. Two of these, Nos. 5 and 6, complaining of the testimony of witnesses that they saw the advertisement, could not, if error, have conceivably been prejudicial error, since both witnesses testified that such deposits as they made were made prior to the advertisements and not on the faith of them, and there was no contention to the contrary. But the admission of this evidence was not error. It was relevant and admissible upon the issue of fraudulent use of the mails, as the advertisements had the purpose not only of getting new deposits, but of preventing withdrawals of those the company already had.

■ Assignment No. 1 goes to the admission in evidence as irrelevant, of a document affecting the Watson estate account. There was no error in admitting this document. Dealing with one of the most important of the claims against it, it was a part of the res gestæ making up the complete picture of the difficulties the association was in and of what was being proposed to be done about them. It is not claimed that the document did not correctly reflect what the parties to it had proposed doing. Appellant was not in any way prevented from fully explaining the transaction.

We come now to the assignments regarding the admission of 72 loose ledger sheets, and 2 work sheets, purporting to show accounts and transactions of appellant and others, and of testimony admitted in regard to them. These, in Groover's handwriting, were found in his home some months after the receivership had been instituted and Groover had been shot to death by appellant. Of the three assignments, the second is directed to the admission of the testimony of Chisholm, the receiver. He was permitted, over the objection of defendant that "it was not shown that the witness was familiar with the Citizens Building & Loan Association's books prior to the time a receiver was appointed for it, and on the further ground that the testimony was illegal and was not admissible against the appellant," to testify that these sheets were, in his opinion, ledger sheets of the association, and to the fact that checks and other records of the association tied in with and corresponded to them. Of the other two, No. 2 goes to the 72 ledger sheets, 53 headed "Roscoe Luke" and purporting to cover his account from April, 1927, to November, 1932, and 19 purporting to cover other accounts. No. 4 goes to two work sheets, written in pencil in the handwriting of Groover, containing not only names and figures, but memoranda of directions given by Luke as to various accounts, and as to Luke's checking money from them. The objection to the ledger sheets was that "it had not been shown that they were papers or records of the Association; that their correctness had not been established, and further, that they had no bearing on the case and were not binding on appellant." The objection to the work sheets was "that it was not shown that they were sheets of the Citizens Building & Loan Association, because it is not shown when they were made, and because

the correctness of same is not shown, and because the papers are mere hearsay." The court let the ledger sheets in. In connection with their admission he permitted the witness Chisholm to identify them as ledger sheets of the company, and to testify as to their contents and their relation to other records. As to the work sheets, Chisholm was permitted to testify that they were work sheets in the handwriting of Groover; that they came from Groover's home and not from the files and records of the association; that there were entries on the work sheets which tied in with the books of the company; and that he did not know when the sheets were made. After the witness had so testified, the court overruled the objection to the work sheets, admitting them, however, "simply for whatever they might be worth as a matter of identification of the records found down there, and not as records indicating the truth of what was on said work sheets." As these three objections go to substantially the same matter, they will be considered together with a view to determining whether there was error in respect to any of the rulings regarding them, and if there was, whether, considering the record as a whole, it can be said that it was prejudicial, requiring reversal.

 Appellant throughout his brief attacks these sheets, and the introduction of evidence regarding them, as though they had been offered as the books of account of others, and must therefore come accredited under the book rule governing the introduction by a party of his own books in his favor, or of the books of others against him. Shreve v. United States (C.C.A.) 77 F.(2d) 2; Beck v. United States (C.C.A.) 33 F.(2d) 107, 113; Phillips v. United States (C.C.A.) 201 F. 259. This was not the purpose of the offer. It was not the situation in which appellant stood with reference to these documents. They were offered as appellant's own records, as his own admissions against interest, made by Groover acting for and with him. Browne v. U. S. (C.C.A.) 290 F. 870; McWhorter v. U. S. (C.C.A.) 281 F. 119, 121; Silkworth v. U. S. (C.C.A.) 10 F.(2d) 711; Shea v. U. S. (C.C.A.) 251 F. 440; Bacon v. U. S. (C.C.A.) 97 F. 35, 41; Worden v. U. S. (C.C.A.) 204 F. 1, 6; Burns v. U. S. (C.C.A.) 279 F. 982; Lewis v. U. S. (C.C.A.) 38 F.(2d) 406. They were offered as acts of his agent and associate Groover, done in the carrying out of the business in which he and Groover were engaged. It

was shown beyond contradiction, in fact, it was admitted, that the association's books had been fraudulently kept, and that appellant had restored to them, some $50,000 of accounts which should have, but had not, appeared on them. It was admitted that when the receiver took charge only a small part of the books could be found, and that such as were found showed on their faces that instead of being regularly and correctly kept, they had been doctored, amended, and patched up within two or three months. Everybody admits that spoliation and record doctoring had been going on. Appellant's claim is that he was innocent; that Groover was responsible for it all. To make an issue by claiming is one thing; to settle it by the claim is another. The most that can be said for appellant is that it was for the jury to say whether appellant's claim was made out. But in order for the jury to decide this issue properly, all the facts bearing upon it would have to be put before them. The ledger sheets and work sheets made by Groover while the business was going on was evidence on this issue of the most vital kind. Rules of evidence are never ends in themselves. They are means, with proof, the end in view. Practical and not theoretical, they are designed and must be applied in order to as fully, and with as little chance for misleading as may be, develop the truth on the issues to be tried. One of the most fundamental and eminently practical of these rules is the rule of necessity, under which, where better evidence may not be had, the triers may take the best evidence of which the case admits. Here there were, until Groover's taking off, two persons in a position to know and to adequately explain the distressing state of the association's affairs; its real insolvency, while apparently solvent; the real meaning of accounts left off the books, the real sources of the large deposits credited to appellant, and most important, what had become of the association's money. One of these was Luke, who dominated and controlled, who was the management, who brought in and put the money out; the other, Groover, who kept the books and records, to note down what was done with and about it. Luke is here; he was able to and did testify to what he knew, and planned, and did; the other, Groover, his confidential employee and by Luke's testimony, his lifelong friend, is dead, removed by defendant's own hand. Under these circumstances, every act of

Groover's, whether written or verbal, apparently done in connection with or bearing upon the business and condition of the company, ought to be admissible as the best evidence the case affords. Particularly ought books and book work done by Groover to be admissible for what it was worth, to throw light on the dark and confused situation brought about by appellant's own hand in taking Groover off. Granting, as appellant swears, that the killing was accidental, and that he would not have shot Groover for the world, because Groover was his best friend, this but makes a stronger case for letting in Groover's memoranda made in the course and during the time of his employment under appellant. For it ought reasonably to be supposed, with such a condition of friendship and trust existing, that these records were not made except with the knowledge and under the direction of appellant. Assuming, on the other hand, that the killing was not accidental, but that it was done to get rid of Groover for the purpose of removing him as a witness to what had been going on, appellant may not be heard to complain when having made it impossible for Groover himself to testify in person, the records and memoranda he would have testified to if living, have been brought into court for appellant to be examined about and to explain. It would, we think, be a most unreasonable view to take of the power to elicit truth, to hold that, in circumstances like these, a court will deliberately close its eyes to Groover's memoranda accredited as these were, when offered as declarations of appellant's associate, made while the business was going forward and pursuant to their understanding, when Groover has, by appellant's act, been prevented from testifying. If these memoranda are not res gestæ, if they do not speak the truth, appellant was in a position to show it. He was at liberty, while on the stand, to explain the source of every dollar that he deposited in the association, or that stood to his account there. He was at liberty to do it, but he did not do so except by wide generalizations. The record is silent as to where the large sums credited to him came from. Though charges are now made against Groover, the record is completely silent of any showing that Groover had enriched himself, or that he had gotten anything from the company but the meager salary and the small loans which stood in his and appellant's names. It is silent as to any fact which impeaches or tends to impeach these records as other than genuine memoranda, set down as matters progressed by Groover as appellant's accomplice and with appellant's knowledge and consent. Accredited as they were, the real question arising on these documents is not whether they were admissible, but as to the weight which should be given them. There was ample circumstantial evidence, to justify their introduction as such, that the ledger sheets were part of the records of the company withdrawn and hidden away. But if they were not ledger sheets, they were memoranda made by Groover, appellant's confidant and friend. They were admissible for what they were worth upon the inquiry as to the state and condition of the business at the time the advertisements were sent out and afterwards.

As to the work sheets, they were not admitted as proof of the matters shown in them. They were admitted merely for what they were worth in determining whether the offered ledger sheets were in fact, ledger sheets of the company. This limitation was, we think, in appellant's favor beyond what he was entitled to. If he and Groover were working together in a fraudulent scheme, and whether they were was for the jury, these work sheets, made while the business was going on and concealed by hiding away, were just as admissible as verbal declarations of Groover, made in the course of the carrying on of the scheme, would have been.

For another reason appellant may not complain of the admission of the work sheets as reversible error. If they were not admissible as declarations of appellant's agent or associate in the scheme, their reception was not prejudicial error, for their effect was expressly limited to their bearing on the identification of the ledger sheets, and they were not admitted as evidence of the facts they showed. If appellant desired other instructions further limiting their effect, he should have asked for them. It appears by stipulation in the record that there was no complaint made of the court's charge. It must therefore be presumed, under this full record showing that evidence presenting many of the matters objected to came in without objection, that whatever additional limitation or explanation of the use or effect of these work sheets appellant was entitled to, he got at his request, or decided to waive.

Under the record in this case, showing the complete wreckage of the corpora-

tion, and that a condition existed when the soliciting advertisements were sent out which made their sending unfair and untrue, the burden is upon appellant to show, in the clearest way, that there was not only error in admitting the evidence he complains of, but prejudice, in that, without this evidence, a conviction could not have been obtained. We think there was ample evidence of the condition of the company at the time the documents were sent out, and of appellant's relation to it, especially in view of his failure to explain the sources of the large sums the books gave him credit for, and of his use of the company to borrow for himself and his friends, to justify the conviction without regard to these sheets. While, therefore, we believe that the evidence was properly admitted, and that there was no error in receiving it, we think it equally plain that if there was error, no prejudice from its reception, requiring reversal, is shown.

The judgment is affirmed.