## UNITED STATES v. BUCHALTER et al.*
### No. 295.

Circuit Court of Appeals, Second Circuit.
March 8, 1937.

J. Arthur Adler and Schwartz & Frolich, all of New York City (I. Maurice Wormser and J. Arthur Adler, both of New York City, of counsel), for appellants.

Robert H. Jackson, Asst. Atty. Gen., Lamar Hardy, U. S. Atty., of New York City, John Harlan Amen, Albert J. Law, and Joseph A. Barrett, Sp. Assts. to Atty. Gen., and Moses M. Lewis, of New York City, for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellants, with eleven other individuals and twenty corporations, were indicted under the Sherman Anti-Trust Act (15 U.S.C.A. § 1 et seq.). They were charged in the first count with conspiring to restrain interstate commerce in rabbit skins; in the second with conspiring to monopolize interstate commerce in such skins; in the third with attempting to monopolize such commerce; and in the fourth with monopolizing it. Before the trial most of the defendants pleaded guilty and as to others there was either severance or dis-

*Writ of certiorari denied United States v. Shapiro, 57 S.Ct. 942, 81 L.Ed. ——.

missal, leaving only the two appellants as defendants when the action was tried. They were both convicted and sentenced on all counts.

As neither of the appellants now question the sufficiency of the proof of the violation by others of the Sherman Anti-Trust Act as alleged in the indictment, it will be neither necessary nor useful to state what was proved in detail. It is enough for present purposes to know that one of the defendants indicted, the Protective Fur Dressers Corporation, had in its membership most of the persons and corporations engaged in the business of dressing rabbit skins in New York and New Jersey and was formed and operated to enable its members to monopolize that industry there. Its methods included threats, violence, and other unlawful acts. It was enabled to carry on its unlawful business with the aid of a so-called Left Wing Union known as the Needle Trades Workers Industrial Union and of a so-called Right Wing Union known as the Lamb and Rabbit Workers Union. Each of these unions controlled the labor in certain shops in the industry and were in some respects antagonistic to each other while co-operating with the Protective Association in furtherance of its unlawful schemes.

It is also claimed by the government, and denied by both appellants, that they were the men behind the scenes who directed the unlawful activities proved. At the close of the government's case neither appellant introduced any evidence but moved to dismiss on the ground that as to them the proof was insufficient to support a conviction. Their motions were overruled after the government had been permitted to reopen the case and introduce further evidence. Then the cause was submitted to the jury with the result above stated.

All that can be, or is, claimed to be proof of any connection of appellant Buchalter with the violations of the Sherman Anti-Trust Act alleged and proved is evidence of numerous calls to and from a room in the Arlington Hotel in New York City which was shown to have been a gathering place used by the conspirators from which at one time an armed attack was made on the headquarters of the Left Wing Union. There was no proof, however, that Buchalter was ever there or that he ever participated in any of the telephone calls. Nothing was shown of what was said or who did talk at any time. The most that can be said about them is that they were fairly numerous and were made to or from the hotel room and various places Buchalter frequented and from some of which he telephoned somewhere. At one time a message was received at one of the places for Buchalter and soon after it was delivered someone called the Arlington Hotel room but it was not shown that it was Buchalter. We are urged to treat this as circumstantial evidence of Buchalter's participation in the conspiracy, it being suggested that other proof is impossible. Even so, the suggestion merely points to a fact requiring the granting of his motion to dismiss. Difficulty of proof is no substitute for actuality of proof and an accused is presumed to be innocent and entitled to be acquitted until proved guilty as charged beyond a reasonable doubt. Here there were, indeed, many suspicious circumstances to lead to the conclusion that Buchalter was guilty, but there was no substantial evidence to overcome the presumption of innocence, and so it was error to deny his motion. Nosowitz v. United States, 282 F. 575 (C.C.A.2); Reed v. United States (C.C.A.) 51 F.(2d) 941; Graceffo v. United States (C.C.A.) 46 F.(2d) 852; Karchmer v. United States (C.C.A.) 61 F.(2d) 623.

Not so, however, in respect to Shapiro. Not only did the government prove the suspicious circumstances of the telephone calls of which a few were made to his home and to the offices of a firm of which he was a member, though it is but fair to say that this so-called evidence in general was no more potent proof as to him than it was as to Buchalter, but there was direct evidence to connect him with the conspiracy and the unlawful acts charged and proved. One Potash, who was the secretary of the New York branch of the so-called Left Wing Union, testified both before the grand jury and at the trial. Rather reluctantly, though positively, he testified at the trial that he gave before the grand jury the testimony below quoted in part and that it was true. He had a conference at the Governor Clinton Hotel in New York City in September, 1932, with one Mittelman, then president of the Protective Corporation, regarding a dispute as to the amount to be paid by the Protective Corporation to the unemployment fund of the Left Wing Union. Of course, this was a part of the unlawful scheme being carried out. The following partial quotation from the testimony of Potash speaks for itself;

"I recall the meeting in the Governor Clinton Hotel in September, 1932. I was

called on the phone at that time by Mr. Mittelman, who told me that he had certain matters to discuss with me in connection with the conditions of dispute that he had with a representative of the union and he asked me to be at the Governor Clinton Hotel and we would discuss the matter there.

"Pursuant to that appointment I went to the Governor Clinton Hotel and met Mr. Mittelman and another gentleman in the lobby of the hotel. I cannot recall the time. That was about four years ago. The other gentleman is known as Mr. Gurrah. His correct name is, I think, Shapiro, I am not certain.

"Q. Do you see him here? Yes, I see him; the gentleman, the first gentleman sitting there (witness indicates defendant Shapiro). I had a conversation with those two gentlemen at that time, very brief.

"As I recall, Mr. Mittelman introduced me to Mr. Shapiro. I asked him why that introduction, what Mr. Shapiro had to do with the conference to which he called me. He said, 'Well, we will meet together,' something to that effect. I can not recall the words. If I recall he said, 'We will sit down and take up that matter' he wanted to take up with me. I said I would have nothing to do with Mr. Shapiro, we were dealing with the president of the Protective Association and nobody else. Mr. Mittelman insisted that we go upstairs and meet jointly. It will be very difficult to use the words used four years ago if you press me on that. If I recall I do not think Mr. Shapiro said anything at that time. Mr. Mittelman did all the talking. I testified before the grand jury.

"Q. I will read you from your testimony.

"'Mr. Amen: Is it stipulated to be the evidence of the witness in this case?

"'Mr. Mattuck: The evidence before the grand jury?

"'Mr. Amen: Yes.

"'Mr. Mattuck: Yes.

"'Q. Was there anybody else there with you at the time? A. No; just the three of us. Mr. Mittelman said, "You will have to deal with Mr. Gurrah because Mr. Gurrah is the association." Well, I refused to deal with him. I said, "If you wish to take up any matters with me concerning the labor matters you will have to do that yourself and I will not deal with Mr. Gurrah." He then asked Mr. Gurrah to excuse

him, and Gurrah said to me then, "Potash, you will have to deal with me whether you like or not," and he went out.'

"Is that correct? A. Well, if I testified to that effect; at that time I certainly was more sure of what happened than I am right now.

"By the Court:

"Well, all I can say is what I testified to then was the truth. It is very difficult to say exactly in the words that we used so long ago. The whole conversation lasted just about three minutes. Well, that is about what transpired then.

"By Mr. Amen:

"Well, it was in substance the same; that is what you read to me.

"By Mr. Amen:

"I remember that Gurrah said to me, 'You will have to deal with me whether you like it or not,' or words to that effect. I do remember he said that. He wanted to take up with us, take up these matters. He insisted on going up. I do recall that he said words to that effect, something like it; nothing different, not that I recall at this moment. I am not disputing the truth of the testimony in any way, directly or indirectly. I continued to negotiate with Mr. Mittelman alone and Mr. Gurrah departed after saying that I would have to deal with him whether I liked it or not, or words to that effect—Yes, Mr. Mittelman asked him to go and he went. I refused to deal, to go through with the deal.

"Q. You deliberately refused to deal while he was there? A. Absolutely."

After Shapiro left, the witness and Mittelman then went upstairs to a room where they conferred regarding the dispute.

 This evidence could have been, and doubtless was, believed by the jury and supplied the necessary connection to put Shapiro into the conspiracy and make the government's evidence applicable to the extent that it was ample to prove his guilt. Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Vause v. United States (C.C.A.) 53 F.(2d) 346. Granting that it was technically error to receive most of the telephone call testimony as evidence against Shapiro, there was so much competent proof of his guilt apart from the telephone calls that he was denied no substantial right or prevented from having a fair trial. He has, therefore, failed to show prejudicial error which

**628**

is ground for reversal. Jud.Code § 269 (28 U.S.C.A. § 391); Luke v. United States (C.C.A.) 84 F.(2d) 711; Rich v. United States (C.C.A.) 271 F. 566; Haywood et al. v. United States (C.C.A.) 268 F. 795; Sneierson v. United States (C.C.A.) 264 F. 268. A general exception was taken to a supplemental charge giving illustrations in explaining circumstantial evidence and what constitutes conspiracy, but it pointed out no specific thing claimed to be erroneous and we find nothing which warrants reversal.

■ The sentence on the first count drawn under section 1 of the Sherman Anti-Trust Act (15 U.S.C.A. § 1) was to imprisonment for one year and to pay a fine of $5,000; that on the second count drawn under section 2 of the Sherman Anti-Trust Act (15 U.S.C.A. § 2) was the same imprisonment to begin at the expiration of that on the first count. On counts 3 and 4 no fines were imposed but instead imprisonment sentences of one year on each count to run concurrently with each other and with the prison sentence under count 2. It is said that these sentences cannot be upheld in that they are all for the same crime. That depends upon whether or not a conspiracy to restrain interstate commerce made unlawful by section 1 is the same crime as a conspiracy to monopolize such commerce made unlawful under section 2 so that an acquittal or conviction under an indictment drawn under one section would be a bar to subsequent prosecution for the same acts under the other. If the offenses are identical in law, the sentences are erroneous but otherwise not. In this case it is true that it was the success of a combination in restraint of interstate commerce which brought about the monopoly of such commerce. But as Judge Hough said in United States v. MacAndrews & Forbes Co. (C. C.) 149 F. 836, 838, in holding that offenses under sections 1 and 2 of the Sherman Anti-Trust Act were not identical: "The offense under the first count was complete when the combination was actually formed with intent to bring about restraint of interstate commerce. The additional overt acts were but cumulative evidence from which the true intent, purpose, and continuance of the combination might be inferred. But they were themselves the proof of the monopoly, and the monopoly consisted in their aggregate effect. That the prosecution in overwhelmingly proving the existence, and intent, and continuance

of the combination proved the monopoly does not in·my opinion render the offenses identical, merely because all the evidence offered was in a sense applicable to both counts." With this we agree and so find no error.

The judgment as to Buchalter is reversed, but as to Shapiro it is affirmed.