**MONTROSE LUMBER CO. v. UNITED STATES and seven other cases.**

Nos. 2356–2361, 2363, 2369.

Circuit Court of Appeals, Tenth Circuit.

Dec. 31, 1941.

574

Thomas K. Younge, of Grand Junction, Colo. (J. P. Helman, of Grand Junction, Colo., on the briefs), for Montrose Lumber Co., Independent Lumber Co., Arthur H. Biggs, W. C. Kurtz, Grand Mesa Lumber Co., and Frank A. Rice, appellants.

Clyde C. Dawson, Jr., of Denver, Colo. (Pershing, Bosworth, Dick & Dawson, of Denver, Colo., on the brief), for Diamond

Lumber & Hardware Co. and Bill Aldrich, appellants.

James C. Wilson, Sp. Asst. to Atty. Gen. (James McI. Henderson and John W. Porter, Sp. Assts. to Atty. Gen., Robert C. Barnard, of Washington, D. C., Henry H. Foster, Jr., Joseph J. Cella, Jr., and James R. Browning, all of Denver, Colo., Thurman Arnold, Asst. Atty. Gen., and Thomas J. Morrissey, U. S. Atty., of Denver, Colo., on the briefs), for the United States.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

Numbers 2356, 2357, 2358, 2359, 2360, and 2361.

An indictment containing two counts was returned against the appellants in causes Nos. 2356 to 2361, inclusive. The first count charged a conspiracy to restrain trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1. The second count charged a conspiracy to monopolize trade and commerce in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2. The appellants entered pleas of nolo contendere. The trial court imposed a sentence on each count. The appellants urged that the offense charged in the first count is the identical offense charged in the second count, and there being but one offense charged, they were, therefore, subject to but one punishment.

Section 1 of the Sherman Act declares that every contract, combination, or conspiracy in restraint of trade or commerce among the several states is illegal, and that every person who shall make any contract or engage in any combination or conspiracy declared by such section to be illegal shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding $5,000 or by imprisonment not exceeding one year, or by both such punishments.

Section 2 of the Sherman Act provides that every person who shall combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states shall be guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both such punishments.

The crime defined by § 1 is legally distinct from the crime defined by § 2.[1]

Congress may provide that separate steps in a single transaction shall constitute separate offenses. If offenses are distinct in law they are not identical, regardless of how closely they are connected in point of fact. A single act may be an offense against two statutes. The test laid down by the adjudicated cases as to the identity of offenses under separate statutory provisions is, does each statutory provision require proof of a fact which the other does not.[2]

We shall assume, without deciding, that the indictment charged but one agreement. Even if the defendants, as a part of a single transaction or agreement, agreed that they would act together to accomplish the object of restraining trade, and further agreed that they would act together to accomplish the object of monopolizing trade, we are of the opinion that they would be guilty of separate and distinct offenses. Proof of that portion of the agreement to act together to restrain trade would sustain a conviction under § 1 of the Act. Proof of that portion of the agreement to act together to monopolize trade would sustain a conviction under § 2 of the Act. Each would require proof of a fact or a portion of the unlawful agreement which the other would not. Here, the indictment charged an unlawful agreement to accomplish the object of restraining trade and an unlawful agreement to accomplish the object of monopolizing trade. We con-

[1] United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 84 L.Ed. 1129;

United States v. MacAndrews & Forbes Co., C.C.N.Y., 149 F. 836, 838;

United States v. Buchalter, 2 Cir., 88 F.2d 625.

[2] Burton v. United States, 202 U.S. 344, 377, 380, 381, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362;

Gavieres v. United States, 220 U.S. 338, 342–344, 31 S.Ct. 421, 55 L.Ed. 489;

Morgan v. Devine, 237 U.S. 632, 639–641, 35 S.Ct. 712, 59 L.Ed. 1153;

Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306;

Curtis v. United States, 10 Cir., 67 F.2d 943, 947;

Bracey v. Zerbst, 10 Cir., 93 F.2d 8, 9;

Piquett v. United States, 7 Cir., 81 F.2d 75, 79;

Ebeling v. Morgan, 237 U.S. 625, 628–631, 35 S.Ct. 710, 59 L.Ed. 1151.

clude it charged separate and distinct offenses. This conclusion is supported, we think, by United States v. Buchalter, 2 Cir., 88 F.2d 625, and United States v. Shapiro, 2 Cir., 103 F.2d 775.

### Numbers 2368 and 2369.

What we have said with respect to causes Nos. 2356 to 2361, inclusive, applies equally to causes Nos. 2368 and 2369.

Count one of the indictment consists of 38 numbered paragraphs.

Paragraph 17 defines "defendant retail lumber dealers" as the corporations and individuals named defendants in paragraphs 14 and 15 of the indictment, and alleges that such retail lumber dealers throughout the period covered by the indictment were members of Mountain States Lumber Dealers Association.[3]

Diamond Lumber & Hardware Company[4] is not named in paragraphs 14 and 15 of the indictment and it is not otherwise charged that it is a retail lumber dealer or that it is a member of the Association.

Aldrich is named in paragraph 15, and it is therein alleged that his residence is Billings, Montana, and that he is officially connected with Aldrich & Company, which is named as defendant in paragraph 9. It is urged here for the first time that Diamond and Aldrich are not sufficiently connected with the conspiracy by the allegations of the indictment. We fail to see the force of this argument. Diamond is specifically named as a corporate defendant in paragraph 9. Aldrich is specifically named as a defendant in his individual capacity in paragraph 15. In paragraph 26 of the indictment it is alleged that "the defendants hereinbefore named * * * have been and are now engaged in a wrongful and unlawful combination and conspiracy to establish, maintain, and enforce an agreed upon, arbitrary, artificial, and unreasonable policy and program of distribution thereby restricting the channels of distribution through which said lumber, lumber products, cement, and other building materials[5] used and consumed within the states of Colorado, Wyoming, and New Mexico, move and are transported in interstate commerce * * * for the purpose and with the intent of unlawfully and unreasonably eliminating, restricting, and preventing competition in" such trade and commerce.

In paragraph 27 it is alleged that it has been and now is a part of such combination and conspiracy that the defendants would do certain things to eliminate competition, to force ultimate consumers to buy such products from certain retail lumber dealers entitled to membership in the Association, to set up and establish the retail lumber dealers named, and other retail lumber dealers, as a class of recognized retail lumber dealers, to confine and restrict the sale of such products by manufacturers and wholesalers to or through such recognized retail dealers, to prevent ultimate consumers and purchasers in Colorado, Wyoming, and New Mexico from buying, shipping, and receiving such products from any manufacturer or wholesaler thereof, to prevent manufacturers and wholesalers from quoting prices for such products to any ultimate consumer or purchaser in such states, to suppress and eliminate competition between retail lumber dealers by rigidly and arbitrarily controlling the act, procedure, and process of recognition of retail lumber dealers on the part of the Association, to induce, require or compel manufacturers and wholesalers of such products to refrain and desist from soliciting trade, quoting prices, and selling such products to nonrecognized retail lumber dealers, to prevent nonrecognized retail lumber dealer competitors from buying, securing, or receiving such products directly from manufacturers and wholesalers, in order to compel nonrecognized retail lumber dealers to purchase their requirements through recognized retail lumber dealers, to interfere with the business and trade in such products of nonrecognized retail lumber dealers for the purpose of enabling and assisting recognized retail lumber dealers to appropriate and acquire the patronage, trade, and business of such nonrecognized retail lumber dealers, and to compel the ultimate consumers and purchasers of such products to buy them from a recognized retail lumber dealer operating a retail establishment nearest to the point where such products are to be used; all of which is alleged with particularity.

In paragraph 28 it is alleged that the conspiracy has been accomplished, carried out, and effectuated during the time covered by the indictment "by the defendants" by divers means, methods, and acts. These acts are set forth in paragraphs 29, 30, 31, 32,

---

[3] Hereinafter called the Association.
[4] Hereinafter called Diamond.

[5] Hereinafter referred to as "such products."

33, 34, and 35, wherein it is alleged that the National Retail Lumber Dealers Association,[6] a federation of regional, state, and metropolitan retail lumber dealers' associations, formulated, adopted, and promulgated so-called distribution statements applicable to such products, which set forth an agreed upon plan and program of controlling the distribution of such products by arbitrarily classifying consumers and purchasers thereof, and allocating and dividing the resultant classifications among manufacturers, wholesalers, and retailers; that the defendants named in the indictment from time to time sought, exacted, and procured written pledges and other promises and agreements from the manufacturers and wholesalers to the effect that such manufacturers and wholesalers would support, adhere to, and enforce such plan and program of distribution control; that the defendants have used and continue to use coercive and concerted action, boycott, and threats of boycott against such manufacturers and wholesalers to induce, require, and compel them to agree to, adhere to, and support such plan and program; and that certain of the defendants have engaged in continuous activity to enforce and effectuate such plan to control the distribution of such products, and to eliminate, suppress, and lessen competition, have formulated and adopted an arbitrary definition of a retail lumber dealer eligible to membership in the Association for the purpose of withholding recognition to retail lumber dealers who failed to support, abide by, or carry out such plan and program, and have formulated and adopted a plan and program to restrict and confine business activities, sales, and deliveries of each retail lumber dealer to a marketing territory or trading area in the immediate vicinity of his business establishment.

While the object of the conspiracy was to benefit recognized retail lumber dealers and members of the Association, and Diamond is not alleged to be either, that would not prevent it from becoming a party to the two conspiracies. Diamond and Aldrich are named as defendants, and it is alleged in count one that the named defendants conspired to restrain trade and commerce and in count two that all the defendants conspired to monopolize trade and commerce. The conspiracies alleged are not restricted to the retail lumber dealers and members of the Association, but specifically include all the defendants and, under the pleas of nolo contendere, these allegations stand as impliedly admitted.

It is urged that count two does not allege conspiracy with sufficient particularity. In count two it is alleged in general language that the defendants conspired to monopolize, control, and dominate a part of the trade and commerce among the several states in such products "under the circumstances and conditions and by use of the means set forth in count one." Thus, it will be seen that count two charged that the defendants agreed and conspired to monopolize trade and commerce by the means, methods, and acts set forth in count one. The methods and means were set out, not as overt acts, because an overt act need not be charged under the Sherman Act, but for the purpose of more particularly describing and characterizing the conspiracies. We are of the opinion that when count two is read with those portions of count one incorporated in count two by reference, the conspiracy alleged in count two is charged with sufficient particularity. See United States v. American Medical Ass'n, 72 App.D.C. 12, 110 F.2d 703, 716.

Finally, it is urged that the object of the conspiracy charged in count two was to restrict sales of such products in interstate commerce to the recognized retail lumber dealers in Colorado, Wyoming, and New Mexico and, therefore, the conspiracy is merely one to restrain and not one to monopolize trade and commerce among the several states.

It is true that in most cases of monopoly of trade, sellers, not buyers, are the actors. However, § 2 of the Sherman Act embraces monopolies of trade and commerce among the several states by whomsoever effected. The words "to monopolize" and "monopoly" reach every act bringing about the prohibited results.[7]

Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 398, 78 L.Ed. 804, was a suit to enjoin a conspiracy to restrain and monopolize interstate commerce in violation of the Sherman Act. It was shown that marketmen, teamsters, and slaughter-

---

6 Hereinafter called the National.

7 Standard Oil Co. v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734;

Lynch v. Magnavox Co., 9 Cir., 94 F.2d 883, 888.

ers had conspired to burden the free movement of live poultry into the metropolitan area in and about New York City. Marketmen had organized an association with allocated retailers among themselves and had agreed to increase prices. To accomplish their objects large amounts of money were raised by levies upon poultry sold. Men were hired to obstruct the business of dealers who resisted. Wholesalers and retailers were spied upon, and by violence and other forms of intimidation were prevented from freely purchasing live poultry. Teamsters refused to handle poultry for recalcitrant marketmen, and members of the Shochtim Union refused to slaughter. In the opinion the court said:

"The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce."

Trade necessarily involves both buying and selling and the control and domination of either monopolizes trade.[8] Combination and conspiracies to restrain interstate commerce or to monopolize any part of it are nonetheless within the reach of the Sherman Act because the conspirators seek to attain their ends by means of intrastate activities.[9]

To monopolize trade and commerce means to control it, to exclude others from trade in commodities in such commerce and prevent them from dealing therein in a free market.[10]

Here, it is charged that National, the Association, and the other defendants, most of whom are retail lumber dealers, undertook to control and dominate sales of such products in interstate commerce in Colorado, Wyoming, and New Mexico as to restrict them to recognized retail lumber dealers and to preclude nonrecognized retail lumber dealers from buying such products in a free market.

We are of the opinion, thus to control interstate commerce in such products and force them to flow to the ultimate consumer solely through these so-called recognized retail lumber dealers and exclude nonrecognized retail lumber dealers from the right to buy such products in a free market amounts to a monopoly of interstate commerce.

The judgments in the several cases are affirmed.

[8] Hood Rubber Co. v. United States Rubber Co., D.C.Mass., 229 F. 583, 587, 588.

[9] Schechter Poultry Corporation v. United States, 295 U.S. 495, 544, 55 S. Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947;

Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963;

Local 167 v. United States, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804;

Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 46, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791.

[10] Patterson v. United States, 6 Cir., 222 F. 599, 619;

American Biscuit & Mfg. Co. v. Klotz, C.C.La., 44 F. 721, 724, 725;

United States v. Trans-Missouri Freight Ass'n, 8 Cir., 58 F. 58, 82, 24 L.R.A. 73;

Peto v. Howell, 7 Cir., 101 F.2d 353, 359;

Standard Oil Co. v. United States, 221 U.S. 1, 51–62, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734.