**BYFORD v. UNITED STATES.**

No. 4102.

United States Court of Appeals
Tenth Circuit.

Oct. 28, 1950.

David Tant, Oklahoma City, Okl. (Wm.
N. Mounger, Oklahoma City, Okl., on the
brief), for appellant.

Robert E. Shelton, U. S. Atty., Oklahoma
City, Okl., for the United States.

Before PHILLIPS, Chief Judge, and
BRATTON and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

An indictment containing three counts was returned against James Shockley, M. B. Clapp, and Byford in the United States District Court for the Western District of Oklahoma. The first count charged that on July 28, 1949, they transported and caused to be transported a forged cashier's check drawn on the Oklahoma National Bank of Oklahoma City, Oklahoma,[1] in the amount of $25,000, from Oklahoma City, Oklahoma, to Shreveport, Louisiana. The second count charged that on August 1, 1949, they caused to be transported such forged check from Shreveport to Oklahoma City. The third count charged that from March, 1949, to and including August 4, 1949, they conspired to commit an offense against the United States, to-wit, to transport or cause to be transported such forged check from Oklahoma City to Shreveport, and from Shreveport to Oklahoma City, and that to effect the object of such conspiracy they committed certain specified overt acts. Shockley and Clapp entered pleas of guilty to each of the several counts in the indictment. Byford was tried and convicted on each of such counts, and was sentenced to imprisonment for ten years and to pay a fine of $10,000 on count one, to imprisonment for ten years on count two, and to imprisonment for five years on count three, each of the sentences of imprisonment to run concurrently with the other two.

The evidence established that Byford, Shockley, and Clapp devised a scheme to forge a cashier's check on the Oklahoma Bank; to have Shockley transport such check from Oklahoma City to Shreveport; to exchange such check at Shreveport for tax-paid whiskey; to transport such whiskey to Oklahoma; to dispose of such whiskey, and after deducting the expenses, to divide the profit three ways. It was part of such scheme that the whiskey should be purchased at Shreveport from F. Strauss & Son, Inc.,[2] and that Shockley would first purchase from Strauss tax-paid whiskey and pay for same with a genuine $10,000

cashier's check, in order to induce Strauss to accept thereafter such forged check, which was to be in the amount of $25,000. The genuine check for $10,000 was purchased, and with it Shockley purchased from Strauss a truckload of tax-paid whiskey, which he transported from Shreveport into Oklahoma. Thereafter, acting under Byford's direction, with dies which Clapp had assisted in preparing, Shockley forged a cashier's check drawn on the Oklahoma Bank for $25,000, transported such check to Shreveport, there purchased an additional truck with funds supplied by Byford and Clapp,[3] purchased with such forged check two truckloads of tax-paid whiskey from Strauss, and transported such whiskey to Oklahoma. As a result of the transfer of such check to Strauss, it was transported for collection from Shreveport to Oklahoma City and reached the Oklahoma Bank on August 4, 1949. The first load of whiskey purchased was concealed at the farm of one Clarence Miller, near Ada, Oklahoma. In accordance with Byford's direction, the whiskey purchased with the forged check was first concealed on the Miller farm, and later, during the early morning hours of August 5, 1949, was removed to a different location.

Byford contends that the court erred in permitting evidence to be introduced with respect to the handling and disposition in Oklahoma of the whiskey acquired with the forged check, and evidence of certain statements made by Shockley and Clapp and certain acts done by Shockley and others, in connection with the handling of such whiskey in Oklahoma, the concealment thereof at the Miller farm and the movement thereof to another location, many of which did not take place in the presence of Byford. The challenge to the admissibility of the evidence is predicated on two grounds: (1) that the conspiracy had terminated, and (2) that such acts and declarations, while in furtherance of the ultimate purpose of the conspiracy—the purchase, transportation and sale of the whiskey, and the division of the proceeds of such sale

1. Hereinafter called the Oklahoma Bank.

2. Hereinafter called Strauss.

3. Clapp gave Shockley $1,000, and Grady King, at Byford's request, gave Shockley $2,000.

—were not in furtherance of the specific conspiracy charged.

■ The forged check reached the Oklahoma City branch of the Federal Reserve Bank of Kansas City, on August 4, 1949, and the only reasonable inference to be drawn from the evidence is that the transportation of such check from Shreveport to Oklahoma City was completed on that date. Hence, certain of the statements and acts of Shockley and Clapp, with respect to which evidence was introduced, occurred after the objects of the specific conspiracy charged had been effected. Moreover, such acts and declarations were not in furtherance of the specific conspiracy charged. However, the specific conspiracy charged was an integral part of a broader conspiracy, the objects of which had not been effectuated, and which had not terminated when such acts and declarations occurred. There can be no doubt that the forging of the check, the transportation thereof to Shreveport, the exchange of the forged check for tax-paid whiskey, the transportation of such whiskey to Oklahoma, the concealment thereof at the Miller farm and the movement thereof to another location were all integral parts of one criminal plan devised by the conspirators; that the evidence with respect to the acquisition, transportation, and concealment of the whiskey was material to establish Byford's connection with the conspiracy charged; and that the acts and declarations with respect to the transportation, concealment, and disposition of the whiskey were in furtherance of such entire plan. In effecting that plan, Byford, Shockley, and Clapp were partners and agents of each other. Byford was the leader, and Clapp and Shockley, especially the latter, were acting under the directions and instructions of Byford. Indeed, many of such declarations were instructions with respect to the disposition of the whiskey, communicated in accordance with Byford's directions by Clapp to Shockley. Clapp and Shockley, with respect to such acts and declarations, were co-partners of Byford and were acting as agents of Byford to execute the objects and purposes of the criminal partnership and within the scope of their authority as such agents. The case falls within the principle announced by this court in Bartlett v. United States, 10 Cir., 166 F.2d 920, 926, where we said: "Moreover, we are of the opinion that the statements made by Edwards to Combs were admissible against Bartlett for another reason. The rule of evidence, under which acts and declarations of one co-conspirator are admitted against his co-conspirator, is founded upon principles which apply to agencies and partnerships. The first statement made by Bartlett to Combs warranted the jury in finding that Edwards, in attempting to arrange with Combs to take her place in the conspiracy, was acting in behalf of Bartlett with authority so to do. If Edwards was acting as the agent of Bartlett when she made her statements to Combs, those statements would be admissible against Bartlett."

■ When an agent makes a statement or does an act authorized by his principal and evidence of such statement or act tends to prove the commission by the principal of an offense with which he is charged, such evidence is admissible against the principal.[4]

The indictment charged as overt acts, numbered 19 to 27, inclusive, certain acts and transactions with respect to the purchase, transportation, and disposition of the whiskey purchased with the forged cashier's check, and certain instructions given with respect to the disposition of such whiskey and the trucks in which it was transported, all of which occurred between August 1, 1949, and the advent of daylight on August 5, 1949. With respect to those matters, the court instructed the jury that they were to be considered only for the purpose of showing the intent of the parties, and as explanatory of the entire transaction, and not as a part of the specific conspiracy charged. As heretofore indicated, we are of the opinion that such evidence was admissible in order to present to the jury a true picture of the broader criminal plan, of which the specific conspiracy

---

4. United States v. Littlejohn, 7 Cir., 96 F. 2d 368, 380; Shama v. United States, 8 Cir., 94 F.2d 1, 4; Luke v. United States, 5 Cir., 84 F.2d 711, 715.

charged was an integral part, and to establish Byford's connection with such conspiracy and the substantive offenses.

Byford urges that the court erred by his comments upon the evidence in his charge to the jury, and cites Minner v. United States, 10 Cir., 57 F.2d 506, 513. It is true, we there condemned that part of the general charge in that case, wherein the court commented on the facts, but we further said:

"In so holding we do not intend to limit the right of a trial judge to properly sum up the facts and express his opinion thereon. To do so is not only his right but, in many cases, his duty. As said by the court in Rudd v. United States, C.C.A.8, 173 F. 912, 914:

" 'A judge should not be a mere automatic oracle of the law, but a living participant in the trial, and so far as the limitations of his position permit should see that justice is done.'

"But in summing up and commenting on the evidence, the trial judge should be governed by certain well recognized limitations inherent in the very nature of the judicial office. He should state the evidence fairly and accurately, both that which is favorable and that which is unfavorable to the accused. His statements should not be argumentative, but impartial, dispassionate, and judicial; and they should be so carefully guarded that the jurors are left free to exercise their independent judgment upon the facts."

We are of the opinion that the comments of the court on the evidence in the charge in the instant case, considered as a whole, comports with the limitations with respect to comments on the evidence by a trial judge, set forth in Minner v. United States, supra.

Clapp testified to certain long distance telephone communications between him and Byford, in which Byford gave him instructions concerning the purchase and disposition of the whiskey purchased with the forged check. Byford denied those conversations. Three telephone toll tickets dated, respectively, August 3, 4, and 5, 1949, showing long distance calls from Clapp's telephone at Oklahoma City to Byford at Shreveport, were introduced in evidence. In so far as these tickets tended to establish long distance calls from Clapp at Oklahoma City to Byford at Shreveport, they were fully and properly identified. There were certain code marks on the tickets, which the identifying witness was not able to explain. The code marks, therefore, conveyed no information to the jury. Neither did Byford request the court to instruct the jury to disregard the code marks. We are of the opinion that the tickets were properly admitted in evidence. Moreover, they were merely cumulative evidence of facts that had been fully established by other competent evidence.

Affirmed.