UNITED STATES of America,
Plaintiff,

v.

The LEARNER COMPANY, Flynn-Learner, Paul W. Learner and Gilbert ("Buck") Wong, Defendants.

Cr. No. 11736.

United States District Court
D. Hawaii.

March 29, 1963.

Lee Loevinger, Asst. Atty. Gen., Harry G. Sklarsky, Washington, D. C., and Lyle L. Jones, San Francisco, Cal., Herman T. F. Lum, U. S. Atty. for the District of Hawaii, Wilbur L. Fugate, Washington, D. C., and Carl L. Steinhouse, Honolulu, Hawaii, Attys., Dept. of Justice, for plaintiff.

Joseph L. Alioto, Louis J. Glicksberg, San Francisco, Cal., and by Walter G. Chuck, Honolulu, Hawaii, for defendants.

TAVARES, District Judge.

The Grand Jury of this District has returned an Indictment, in four Counts, against two corporations: The Learner Company and Flynn-Learner, and two individuals: Paul W. Learner, alleged to be the President of The Learner Company and the President of Flynn-Learner, and Gilbert ("Buck") Wong, alleged to be Manager and Vice-President of Flynn-Learner.

Count I charges a violation of Section 1 of the Sherman Act [1] and Counts II, III and IV charge violations of Section 2 of the Sherman Act [2] in conspiracies with persons unknown and with certain other companies not made defendants.

The defendants have moved to dismiss the Indictment on the grounds that the Court is without jurisdiction because the alleged offenses are cognizable only under the laws of Japan and that no Count of the Indictment states an offense. They have moved in the alternative that the Government be required to furnish a bill of particulars stating which acts alleged are claimed to affect the United States and to come within its laws as distinguished from the allegations which either took place in or affect Japan under its laws.

All Counts allege that, since World War II and until the establishment of a small electric steel mill in Hawaii in July, 1960, the major part of the scrap metal collected in Hawaii was exported to Japan and, since July, 1960, a substantial part of the scrap metal collected in Hawaii has been used by the steel mill, that, at all times during the period covered by the Indictment, defendants, The Learner Company and Paul W. Learner, exercised control and direction of the business and affairs of Flynn-Learner, that, since 1951 to the time of the return of the Indictment, Flynn-Learner has engaged, in Hawaii, in the business of collecting, processing and exporting

scrap metal, primarily to Japan, that, from 1956 to 1961, Hilo Metals Company exported scrap metal to Japan through National Metals, Ltd., that, from 1956 to 1961, Flynn-Learner and National Metals, Ltd., were the only dealer-exporters of scrap metal from Hawaii and that Flynn-Learner is now the only regular dealer-exporter of scrap metal in Hawaii.[3]

All Counts further allege that from 1956 to the time of the filing of the Indictment the exports of scrap metal from the West Coast of the United States and Hawaii to Japan have amounted to "several million tons with a value of over one hundred and fifty million dollars annually."

They further allege that the conspiracies consisted of continuing agreements and concerts of action among the defendants and the other alleged co-conspirators, the substantial terms of which are alleged to be as follows:

(a) To jointly negotiate with the Japanese "A," "B," "C," "D" and "E" Steel Scrap Coordinating Committees or Cartels, representing and acting as exclusive agents for the major Japanese steel mills and for over 90% of all Japanese steel mills, for the sale of scrap metal exported from the United States;

(b) To secure exclusive arrangements and enter into exclusive contracts with said Japanese committees and steel mills whereby only nine United States "recognized" shippers of scrap metal, consisting of defendant, The Learner Company, and the co-conspirators named herein, would be allowed to ship scrap metal to over 90% of all Japanese steel mills;

(c) To fix and maintain identical or similar terms and prices in such contracts with said Japanese committees and steel mills;

(d) To exclude other "outside" United States dealers in, and exporters of,

1. 15 U.S.C. § 1.

2. 15 U.S.C. § 2.

3. The Indictment defines "dealer-exporter" as any individual or entity which bids

for and purchases scrap metal from all sources and prepares it for export or for resale to steel mills."

scrap metal from selling and exporting scrap metal to steel mills representing over 90% of the Japanese market for scrap metal; and

(e) To allocate among themselves territories of the United States for the export and shipment of scrap metal to Japan, The Learner Company being the only "recognized" shipper operating in the allocated area of Hawaii.

They further allege that the defendants and co-conspirators did the things they allegedly conspired to do and that each of the alleged offenses was carried out in part in Hawaii within five years preceding the filing of the Indictment.

They allege that the offenses alleged had the following effects in Hawaii:

(a) Defendant, Flynn-Learner, became the only dealer in Hawaii which could export scrap metal from Hawaii to Japan;

(b) Dealers and dealer-exporters and potential dealers and potential dealer-exporters in scrap metal in Hawaii have been foreclosed from exporting to the Japanese market;

(c) Competitors of Flynn-Learner in Hawaii, particularly National Metals, Ltd., and Hilo Metals Company, not being able to export their scrap metal, have been forced out of the scrap metal business as dealers and dealer-exporters in Hawaii;

(d) Dealers of scrap metal in Hawaii have been deprived of the opportunity to sell scrap metal to competing purchasers;

(e) Prices of scrap metal purchased in Hawaii by defendant, Flynn-Learner, have been unreasonably lowered, forcing many scrap metal collectors and peddlers out of business; and

(f) Dealers and dealer-exporters in Hawaii other than defendants, Flynn-Learner and The Learner Company, were deprived of the opportunity to sell their scrap metal to the steel mill.

Count I charges a conspiracy in restraint of foreign trade and commerce in violation of Section 1 of the Sherman Act.[4]

That section provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal"

shall be guilty of an offense.

■ A restraint of trade must be unreasonable to be in violation of the Sherman Act.[5]

■ A conspiracy to fix prices of a commodity is an unreasonable restraint of trade per se under Section 1 of the Sherman Act if it affects interstate or foreign commerce.[6] The amount of interstate or foreign trade involved is immaterial.[7] Foreclosure, through a conspiracy, of competitors from a substantial market is unlawful per se.[8] The allocation of territories for the purpose

---

4. The Indictment defines "Hawaii" as the Territory of Hawaii prior to August 21, 1959, and the State of Hawaii since August 21, 1959. Section 1 of the Sherman Act applies to the States. Section 2 of the Sherman Act applies to the Territories. The failure to allege that there was a violation of Section 2 while Hawaii was a Territory is immaterial. Johnson v. United States (1953), 9th Cir., 14 Alaska 380, 206 F.2d 806, 808.

5. United States v. Waltham Watch Co (1942), D.C.N.Y., 47 F.Supp. 524, 531.

6. United States v. Socony-Vacuum Oil Co. (1940), 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129.

7. Id., pp. 224–225, n. 59, 60 S.Ct. p. 845.

8. International Salt Co., Inc. v. United States (1947), 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20.

of suppressing competition violates the Sherman Act.[9]

Count I alleges a conspiracy from 1956 to the time of the filing of the Indictment, between the defendants and others, with overt acts, to fix the prices of scrap metal exported to Japan, to foreclose competitors from the Japanese market, which was a substantial one, and to allocate among themselves territories of the United States for the export of scrap metal to Japan for the purpose of suppressing competition and that they did the things which they had so conspired to do, in part in Hawaii.

Count II charges a conspiracy to monopolize foreign trade and commerce, Count III charges an attempt to monopolize, by a conspiracy, foreign trade and commerce and Count IV charges the monopolizing, by a conspiracy, of foreign trade and commerce [10] in violation of Section 2 of the Sherman Act. That section provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations," shall be guilty of an offense.

"To monopolize trade and commerce means to control it, to exclude others from trade in commodities in such commerce and prevent them from dealing therein in a free market." [11]

Count II alleges that the defendants and others conspired, with overt acts, and Count III alleges that they attempted, by a conspiracy, to control foreign trade and commerce, to exclude others from trade in scrap metal in such commerce and prevent them from dealing therein in a free market and that they did the things they had so conspired to do, in part in Hawaii and all from 1956 to the time of the filing of the Indictment. Count IV alleges that, by a conspiracy, they controlled foreign trade and commerce and excluded others from trade in scrap metal in such commerce and prevented them from dealing therein in a free market, all in part in Hawaii and all from 1956 to the time of the filing of the Indictment.

It is not clear what the defendants intend by their ground for dismissal of the Indictment that "the offense, if any, is cognizable only under the laws of Japan." Their memorandum in support of their motion to dismiss the Indictment seems to indicate that their contention is that there is no violation of the Sherman Act by dealing with a foreign cartel which is not illegal in the foreign country.

In Continental Ore Co. v. Union Carbide & Carbon Corp. (1962), 370 U.S. 690, at page 704, 82 S.Ct. 1404, at page 1413, 8 L.Ed.2d 777, the Supreme Court said:

"A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries."

In United States v. Sisal Sales Corporation (1927), 274 U.S. 268, at page 275, 47 S.Ct. 592, at page 593, 71 L.Ed. 1042, the Supreme Court said:

"The circumstances of the present controversy are radically different from those presented in American Banana Co. v. United Fruit Co., supra, and the doctrine there approved is not controlling here. The Banana Company sued for treble

9. United States v. General Dye-Stuff Corporation (1944), D.C.N.Y., 57 F.Supp. 642, 647.

10. The paragraph of Count III specifically charging an attempt to monopolize and the paragraph of Count IV specifically

charging monopolizing do not mention conspiracies. However, the allegations of conspiracy in Count I are incorporated by reference in these Counts.

11. Montrose Lumber Co. v. United States (1941), 10th Cir., 124 F.2d 573, 578.

damages under the Sherman Act, basing its claim upon acts done outside the United States and not unlawful by the law of the place. 'The substance of the complaint is that, the plantation being within the de facto jurisdiction of Costa Rica, that state took and keeps possession of it by virtue of its sovereign power. But a seizure by a state is not a thing that can be complained of elsewhere in the courts.' 'A conspiracy in this country to do acts in another jurisdiction does not draw to itself those acts and make them unlawful, if they are permitted by the local law.'

"Here we have a contract, combination and conspiracy entered into by parties within the United States and made effective by acts done therein. The fundamental object was control of both importation and sale of sisal and complete monopoly of both internal and external trade and commerce therein. The United States complain of a violation of their laws within their own territory by parties subject to their jurisdiction, not merely of something done by another government at the instigation of private parties. True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States. They are within the jurisdiction of our courts and may be punished for offenses against our laws."

All four Counts of the Indictment sufficiently charge offenses under the Sherman Act within the jurisdiction of the United States.

The motion to dismiss is denied.

■■ As to the alternative motion for a bill of particulars, requiring the government to state which acts alleged are claimed to affect the United States and to come within its laws as distinguished from the allegations which either took place in or affect Japan under its laws, in United States v. Tolub (1960), D.C.N.Y., 187 F.Supp. 705, at page 710, the Court said:

" 'The defendant is generally held to be entitled to those particulars necessary to enable him to prepare his defense, avoid surprise, and plead double jeopardy.' * * * But, except to the extent necessary to fulfill these functions, the government is not required to make full disclosure of the evidence which it hopes to adduce at trial, or of the legal theories upon which it intends to rely. * * * "

For the reasons above stated the motion for a bill of particulars is denied.