**UNITED STATES v. NATIONAL CITY LINES, Inc., et al.**

Nos. 9943–9953.

United States Court of Appeals
Seventh Circuit.

Jan. 3, 1951.

Rehearing Denied Jan. 31, 1951.

See also 7 F.R.D. 393.

Joseph Thomas, Akron, Ohio, for Firestone Tire & Rubber Co. and L. R. Jackson.

Henry M. Hogan, New York City, for General Motors Corp. and H. C. Grossman.

John H. Hershberger, Chicago, Ill., Mayer, Meyer, Austrian & Platt and Poppenhusen, Johnstone, Thompson & Raymond, all of Chicago, Ill., of counsel, for Mack Mfg. Corp.

John T. Chadwell, Chicago, Ill., C. Frank Reavis, New York City, Weymouth Kirkland, A. Leslie Hodson, Charles R. Morrow, Ferris E. Hurd, Edward R. Johnston and John Paul Stevens, all of Chicago, Ill., Rayburn L. Foster, Bartlesville, Okl., Paul

564

M. Godehn, H. Templeton Brown, Chicago, Ill., for other appellants.

William C. Dixon, Chief, Edwin U. Driscoll and Alex D. Fred, U. S. Department of Justice, all of Los Angeles, Cal., Willis L. Hotchkiss, Ralph M. McCareins, Atty., Dept. of Justice, Chicago, Ill., William Amory Underhill, Acting Asst. Atty. Gen., Richard E. Guggenheim, Sp. Asst. to Atty. Gen., for appellee.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

On April 9, 1947, nine corporations and seven individuals, constituting officers and directors of certain of the corporate defendants, were indicted on two counts, the second of which charged them with conspiring to monopolize certain portions of interstate commerce, in violation of Section 2 of the Anti-trust Act, 15 U.S.C.A. § 2. The American City Lines having been dismissed, the remaining corporate and individual defendants were found guilty upon this count. From the judgment upon the verdict, the remaining eight corporate defendants and five of the individuals have perfected this appeal. They contend that the count fails to state an offense, that the evidence is insufficient to support the verdict, that a fatal variance between the proof and the charge exists and that the court erred in excluding certain evidence.

The first count of the indictment, with which, in view of the fact that defendants were acquitted thereon, we are only incidentally concerned, charged defendants with having knowingly and continuously engaged in an unlawful combination and conspiracy to secure control of a substantial number of the companies which provide public transportation service in various cities, towns and counties of the several states, and to eliminate and exclude all competition in the sale of motor busses, petroleum products, tires and tubes to such transportation companies then owned or controlled by National City Lines, Inc., or Pacific City Lines, Inc., or of which said companies should acquire control, in the future, all in violation of Section 1 of the Anti-trust Act, 15 U.S.C.A. § 1.

The second count charged defendants with having conspired to monopolize part of the interstate trade and commerce of the United States, to wit, that part consisting of the sale of busses, petroleum products, tires and tubes used by local transportation systems in those cities in which defendants National, American and Pacific owned, controlled or had a substantial financial interest in, or had acquired, or in the future should acquire ownership, control or a substantial financial interest in such transportation systems, in violation of Section 2 of the Act.

It was averred further that the conspiracy to monopolize had consisted of a continuing agreement and concert of action upon the part of defendants under which the supplier defendants, Firestone, Standard, Phillips, General Motors and Mack, would furnish capital to defendants National, American and Pacific, and the latter companies would purchase and cause their operating companies to purchase from the supplier companies substantially all their requirements of tires, tubes and petroleum products; the capital made available by the supplier defendants would be utilized by National and Pacific, to purchase control of or financial interest in local public transportation systems, located in various states, when the securing of such control and interest would further the sale of and create an additional market for the products of the supplier defendants to the exclusion of products competitive therewith; National and Pacific and their operating companies would not renew or enter into any new contracts for the purchase or use of such products from companies other than the supplier defendants without the consent of the latter; National and Pacific would not dispose of their interest in any operating company without requiring the party acquiring the same to assume the obligation of continuing to purchase its requirements of the commodities mentioned from the supplier defendants, and would not purchase any new equipment making use of products other than those

sold by the supplier defendants; as National and Pacific acquired local transportation systems in the other sections of the country, those markets would be allocated to and preempted by a company selling petroleum products in such sections. The count further charged that the agreements and understandings were carried out and effectuated, thereby completing the offense of monopolization of a part of Interstate Commerce. The jury having acquitted defendants upon the first count and having found them guilty upon the second, we are concerned only with the legality of the judgment entered upon that verdict.

We shall follow the pattern adopted by the parties, who have referred to the National City Lines, Inc., and Pacific City Lines, Inc., as the City Lines defendants and to Firestone, Phillips, General Motors, Mack, Standard Oil of California and Federal Engineering Corporation as supplier defendants.

It is undisputed that on April 1, 1939, defendant National City Lines, Inc., had grown from an humble beginning in 1920, consisting of the ownership and operation of two second-hand busses in Minnesota, to ownership or control of 29 local operating transportation companies located in 27 different cities in 10 states. At the time the indictment was returned, the City Lines defendants had expanded their ownership or control to 46 transportation systems located in 45 cities in 16 states. The supplier defendants are manufacturers and marketers of busses, tires, tubes and petroleum products necessarily used by the local operating companies of the City Lines defendants and others. The value of their products introduced in commerce and sold to the City Lines defendants and their operating companies for the year 1946 was over 11 million dollars and, for the period from 1937 to May 1, 1947, over 37 million dollars.

There is no dispute that the City Lines defendants and the suppliers entered into various oral and written arrangements in accord with which the latter purchased preferred stock from the former, at prices in excess of the prevailing market prices, amounting in total cost to over nine million dollars and that the money received from the sales of such stock was used by City Lines defendants to acquire control of or a substantial financial interest in various local transportation companies throughout the United States. The respective supplier defendants entered into separate ten-year contracts with City Lines under which all of the busses, tires, tubes, and petroleum products requirements of the City Lines operating companies were purchased from the suppliers with an agreement not to buy any part of the same from any party competing with them. They provided, in short, that existing purchase contracts of all operating companies with other competitive suppliers should be terminated at their earliest possible moment; that the operating companies would equip all their units with defendant suppliers' products to the exclusion of any products competitive therewith and that City Lines and their operating companies would not renew or enter into any new contracts with third parties for the purchase of such products or change any then existing type of equipment or purchase any new equipment using any fuel or means of propulsion other than gas.

National City Lines, organized in 1936, as a holding company to acquire and operate local transit companies, had bought, up to the time when the contracts were executed, its necessary equipment and fuel products from different suppliers, with no long-term contract with any of them. Pacific City Lines was organized for the purpose of acquiring local transit companies on the Pacific Coast and commenced doing business in January 1938. American was organized to acquire local transportation systems in the larger metropolitan areas in various parts of the country in 1943. It merged with National in 1946.

Additional facts, while not largely in dispute, are partially controverted, at least in so far as inferences are concerned; however, we think the evidence adequately justified the jury in finding affirmatively that they existed. In 1938, National conceived the idea of purchasing transportation systems in cities where street cars were no longer practicable and supplanting the latter with passenger busses. Its capital was

limited and its earlier experience in public financing convinced it that it could not successfully finance the purchase of an increasing number of operating companies in various parts of the United States by such means. Accordingly it devised the plan of procuring funds from manufacturing companies whose products its operating companies were using constantly in their business. National approached General Motors, which manufactures busses and delivers them to the various sections of the United States. It approached Firestone, whose business of manufacturing and supplying tires extends likewise throughout the nation. In the middle west, where a large part of its operating subsidiaries were to be located, it solicited investment of funds from Phillips, which operates throughout that section but not on the east or west coast. Pacific undertook the procurement of funds from General Motors and Firestone and also from Standard Oil of California, which operates on the Pacific coast. Mack Truck Company was also solicited. Eventually each of the suppliers entered into a contract with City Lines defendants of the character we have described whereby City Lines companies agreed that they would buy their exclusive requirements from the contracting supplier and from no one else. We think the evidence is clear that when any one of these suppliers was approached, its attitude was that it would be interested in helping finance City Lines, provided it should receive a contract for the exclusive use of its products in all of the operating companies of the City Lines, so far as busses and tires were concerned, and, as to the oil companies, in the territory served by the respective petroleum companies. It may be of little importance, but it seems to be the fact, at least we think the jury was justified in inferring it to be the fact, that the proposal for financing came from City Lines but that proposal of exclusive contracts came from the suppliers. At any rate, it is clear that eventually each supplier entered into a written contract of long duration whereby City Lines, in consideration of suppliers' help in financing City Lines, agreed that all of their operating subsidiaries should use only the suppliers' products. These were not joint contracts; each supplier entered into a separate agreement. Whether the action of the suppliers in this connection was so concerted as to justify the jury in finding that defendants conspired to monopolize that segment of interstate commerce reflected by the purchase and shipment in commerce of busses, tires and petroleum products to the operating companies, we shall discuss more fully later. The facts related present only a sketchy outline of the setup as it was presented to the jury.

## The Sufficiency of the Indictment.

Defendants' first point is stated thus: "Count II alleges as a violation of Section 2 of the Sherman Act no more than a conspiracy to monopolize sales to certain specified customers. That allegation does not charge an offense against the United States, since section 2 of the Sherman Act applies only to the monopolization of a geographic market." We have seen that the charge is that defendants conspired to monopolize the sale of petroleum products, busses and tires, to the subsidiary operating companies of the City Lines defendants with the result that competition was done away with in the sale of those products to those customers. But, say the defendants, there is no averment that the purchases of petroleum products, busses and tires by the City Lines defendants constituted a substantial portion of the total market for such products. Though defendants recognize that Section 2 makes it unlawful to conspire to monopolize trade or commerce among the several states, they insist that sales to the City Lines defendants and their subsidiaries do not constitute a part of interstate trade within the meaning of Section 2, for the reason that they amount only to control of a single customer's business. They admit that, if the statute were to be given literal reading, the Government's position would be supportable, for the words "any part" are broad enough to apply to a single customer. However, relying upon Standard Oil Co. of N. J. v. United States, 221 U.S. 1, 31 S. Ct. 502, 55 L.Ed. 619, they argue that the

commerce referred to by the words "any part" has both a geographical and a distributive significance not present in the indictment. They admit that it is not open to a monopolist to defend his monopoly on the ground that he controls sales in only a limited geographic area, and that monopolization of the sale of any one product in any one city may be unlawful, even though sales throughout the nation are not controlled, but they insist that the indictment does not charge monopolization of the sale of gas, tires or busses in any state, city or region but only of sales to one customer which are beyond the rule of reason established in the Standard Oil case, 221 U.S. 1 at 61, 31 S.Ct. 502 at 516, 55 L.Ed. 619. They also rely upon Patterson v. United States, 6 Cir., 222 F. 599, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499, and United States v. Standard Oil Co., C.C., 173 F. 177, 191, where Judge Sanborn said: "If the second section of the act prohibits every attempt to monopolize any part of interstate commerce, it forbids all competition therein, and defeats the only purpose of the law; for there can be no competition, unless each competitor is permitted * * * to draw to himself, and thereby to monopolize, some part of the commerce." They argue that requirement contracts with separate customers do not monopolize any part of interstate trade and that this contention is supported by United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. Zealous argument is made in support of their contention that, under the decisions upon which they rely, the charge in the indictment is not sufficient to sustain a conviction under Section 2 of the Act. However, in spite of the ardor of counsel, after mature consideration, we are not persuaded of the soundness of the argument.

The indictment charges a concerted conspiracy by the City Lines defendants and supplier defendants to monopolize that part of interstate commerce which consists of all the busses, all the tires and tubes and all the gas, oil and grease, used by the public transportation systems of some 45 cities owned or controlled by the City Lines companies. That, to our mind, is a very substantial segment of interstate commerce, having "geographic and distribution" significance. It is charged that, under the plan of defendants, competing suppliers may not be patronized; that only the suppliers' products and theirs alone will be accepted. It is perfectly obvious that under such averments, that part of commerce which would be reflected in other suppliers furnishing products would be foreclosed and barred. Their competition is completely eliminated and the business of supplying busses, tubes, tires to the public transportation system of the 45 cities is entirely in the hands of the suppliers,—in other words, monopolized by them. We conclude that, on the face of the indictment, there is a charge of elimination of competition, of monopolization, as to a substantial segment of interstate commerce, within the language of the Act and as limited by the "rule of reason."

We are impelled largely to this conclusion by United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010. In the course of that opinion, the court employed language, which, to our minds, is well-nigh conclusive upon the issue of sufficiency of this indictment. On pages 226 and 227 of 332 U.S., 67 S.Ct. on page 1565, 91 L.Ed. 2010, is found a paragraph which we adopt, substituting, however, for the words "cab" and "taxi" therein the words "bus and busses." With that change only, it reads as follows: "By excluding all bus manufacturers other than CCM from that part of the market represented by the bus operating companies under their control, the appellees effectively limit the outlets through which busses may be sold in interstate commerce. Limitations of that nature have been condemned time and again as violative of the Act. Associated Press v. United States, 326 U.S. 1, 18, 19, 65 S.Ct. 1416, 1423, 1424, 89 L.Ed. 2013, and cases cited. In addition, by preventing the bus operating companies under their control from purchasing busses from manufacturers other than CCM, the appellees deny those companies the opportunity to purchase busses in a free, competitive market. The Sherman Act has never been thought to sanction such a conspiracy to restrain the free purchase of goods in interstate

commerce." We can conceive of no logical basis upon which we can distinguish this language from the averments of the indictment here.

In the same case, the Supreme Court proceeded, 332 U.S. on pages 225 and 226, 67 S.Ct. on page 1564, 91 L.Ed. 2010, as follows: "And § 2 of the Act makes it unlawful to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy. The complaint in this case deals with interstate purchases of replacements of some 5,000 licensed taxicabs in four cities. That is an appreciable amount of commerce under any standard. See Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608." If we again substitute for the word "taxicabs" the word "busses," the language is directly applicable to the case at bar. If, by preventing controlled cab operating companies in four cities from purchasing cabs from manufacturers other than the one favored, opportunity to purchase cabs in a free competitive market is removed and monopolization results, we can see no reason why prevention of 46 controlled bus operating companies in 45 cities from purchasing busses from any manufacturer other than the one favored is not likewise destructive of a free competitive market and an attempt to monopolize that segment of commerce. True, under this indictment, other suppliers may sell to other customers in various cities; but one substantial segment of interstate commerce consisting of supplies to 46 public transportation systems in 45 cities, holding local monopolies, is charged to have been monopolized so far as their purchases of busses, gas, grease, oil and tires are concerned. As the Supreme Court said in the Yellow Cab case: "Likewise irrelevant is the importance of the interstate commerce affected in relation to the entire amount of that type of commerce in the United States. The Sherman Act is concerned with more than the large, nation-wide obstacles in the channels of interstate trade. It is designed to sweep away all appreciable obstructions so that the statutory policy of free trade might be effectively achieved. As this Court stated in Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356, 'The provisions of §§ 1 and 2 have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce.' " We do not find anything in United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, at odds with the announcements of the Yellow Cab case.

### The Alleged Inconsistency of the Verdicts.

 Defendants contend that the charges in the two counts were in substance the same and that, inasmuch as the same evidence was relied upon by the government to support each, the verdict of acquittal on Count 1 is inconsistent with that of guilty on Count 2; that, though we have previously held that an inconsistency in verdicts does not as a matter of law prevent judgment from being entered on the verdict rendered, the inconsistency here strips the verdict of any logic or valid reasoning.

We have seen that the language of the first count is entirely different from that of the second, for it charges, first, a conspiracy to acquire control of a substantial number of the companies which provide local transportation service in various cities of the United States,—conspiracy to restrain trade by obtaining control of companies conducting transportation systems in various cities. This is a far cry from a charge of monopolization of sales of supplies to such transportation companies. True, Count 1 does include a further charge of conspiracy to eliminate and exclude all competition in the sale of motor busses, petroleum products, tires and tubes to the transportation companies. Thus Count 1 undoubtedly meant to the jury that defendants were charged with restraint of trade in obtaining control of transportation systems plus a conspiracy to restrain competition in sales to those companies.

Though it is immaterial, we think it was entirely reasonable for the jury to conclude that the entire charge of the first count had not been sustained. In other words, it seems clear that there is no inconsistency in the verdicts. This thought is fortified by holdings that the same acts and course of conduct may constitute separate violations of Sections 1 and 2 of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 84 L. Ed. 1129; United States v. MacAndrews & Forbes Co., C.C., 149 F. 836, 838; United States v. General Motors Corp., 7 Cir., 121 F.2d 376; United States v. Buchalter, 2 Cir., 88 F.2d 625, 628; Montrose Lumber Co. v. United States, 10 Cir., 124 F.2d 573. At all events, we can see no inconsistency in the jury's finding that there was a conspiracy to acquire a monopoly of the sales to local transportation companies in 45 communities but no conspiracy to restrain trade by securing control of those transportation systems.

However, irrespective of the correctness of our views in this connection, it is clear that inconsistency in verdicts rendered on separate counts of an indictment is not fatal. We so held in United States v. General Motors, 7 Cir., 121 F.2d 376 at page 411, as did the 6th Circuit in American Tobacco Co. v. United States, 147 F.2d 93, 115, where the court said: "But the circumstance that there might be perceived an inconsistency in a possible finding of guilt on the charge of conspiring to monopolize by price-fixing, and a verdict of not guilty on a charge of conspiracy to restrain trade by the same means, would not vitiate the charge or the verdict." To the same effect is the holding in Garrison v. Hunter, 10 Cir., 149 F.2d 844, 845: "Where a defendant is charged by two or more counts in an indictment, consistency between the verdicts on the several counts is not necessary. A verdict of acquittal on one count does not invalidate a verdict of guilty on another count although the same evidence is offered in support of each." The correctness of these decisions, we think, is apparent from such Supreme Court cases as Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, and Borum **v.** United States, 284 U.S. 596, 52 S.Ct. 205, 76 L.Ed. 513. We conclude, then, that there was no inconsistency of verdicts and, further, that even if there were an inconsistency, the law recognizes no exception to the rule that such inconsistency is wholly immaterial. We are not persuaded that the verdict of guilty is, by the circumstances of this case, robbed of any presumption ordinarily applied to a jury verdict, for we are concerned not with whether the defendants were rightfully acquitted on Count 1, a wholly irrelevant question, but with whether the evidence is sufficient to sustain a verdict of guilty on Count 2.

### Sufficiency of Evidence.

Defendants maintain that, even though we hold that Count 2 of the indictment sufficiently charges them with an offense against the United States, their conviction must be set aside for the reason that the evidence does not support the verdict. It is their contention that the evidence fails to establish (1) that there was a conspiracy, (2) that the defendants or any of them acted with an unlawful specific intent, or (3) that they shared such intent in an illegal concerted undertaking, but that it discloses only activities lawful in all respects. The government, on the other hand, asserts that the evidence establishes the existence of all the elements essential to a finding of guilty and that, consequently the verdict may not be disturbed by this court on review. This difference presents the difficult crucial question of this appeal. Of course we are not trying this case *de novo;* nor are we called upon to decide whether as triers of the facts we would have found defendants guilty. Our only function is to determine whether the evidence was of such character as to require submission to the jury, or in other words, whether it was the duty of the trial court, as a matter of law, to direct a verdict of not guilty. The proper discharge of this function has made it necessary for us to scrutinize with care voluminous evidence upon which we can only briefly comment, if this opinion is to be limited to a reasonable length.

The first evidentiary question presented is whether the evidence was sufficient to support a finding that defendants acted in concert, with a common design or purpose. The government's evidence, much of it in documentary form, is that, during the period preceding the execution of the contracts under consideration, representatives of the City Lines defendants on several occasions met and conferred with one or more of the supplier defendants; that each of the latter knew that other supplier defendants had executed or were about to execute investment and requirements contracts with one or more of the City Lines defendants, and that these conferences and proposed contracts were the subject of no inconsiderable amount of correspondence among the several defendants, including correspondence between supplier defendants as well as between supplier defendants and City Lines defendants. Thus on February 6, 1938, National City Lines wrote Palmer of Standard of California in reference to its proposed stock subscription contract, that it "must be sent" also to Yellow Truck (General Motors) and sent copies of the letter to Grossman of General Motors, Fitzgerald and Stevens. On March 5, National City wrote Standard, saying that at a conference it was "understood" that the stock of Pacific would be subscribed by Standard and Yellow Truck (General Motors). Copies of the letter went to Palmer, Grossman, Fitzgerald and Stevens. On November 7, 1939, National advised Mack of Yellow Truck's (General Motors) and Standard's investments in Pacific. Before that, on May 10, 1938, National had addressed a letter to the "subscribers to the capital stock of Pacific City Lines," advising them of the exact commitment of each subscriber. A file memorandum tells of a conference on February 2 and 3, 1939, in which the investments of Phillips and "other prospective investors," in return for exclusive supply contracts, were discussed at length. The "others" included Firestone, Standard and General Motors. Copies of the memorandum went to various individuals. A letter of April 19, 1939, from National to Phillips, refers to the agreement of Phillips and "other

purchasers" and states that "You are buying the stock at $50 a share, when the market, which is very thin, is about $40," and advises Phillips that "certain privileges of yours under the oil contract are affected by your holding or failure to hold your stock." A copy was sent to Firestone. A letter to Firestone written February 18, 1939, advises that company that Phillips was then making its investigation. Another of February 25 advised Firestone that the Pacific Lines "deal is closed" and that Phillips was "practically ready for closing" and that "two or three other deals" "were very hot." On March 6, 1939, Firestone wrote Phillips concerning its contract with City Lines. On April 12, 1939, Phillips wrote Firestone expressing its belief that "everything has now been mutually agreed upon" and on July 26, Phillips wrote Firestone that "General Motors and Mack Truck are going in for $500,000 each on the same basis as the rest of us." To this Firestone replied that it understood that General Motors, Mack Truck and Standard "were in" and that "we will probably all benefit by the agreement." Many other letters and documents persuasive of concerted understanding were received in evidence.

Although defendants insist that each supplier merely obtained business from the City Lines defendants through separate negotiations, the documentary evidence referred to above and other circumstances in evidence seem to us clearly sufficient to justify the jury in finding that the contrary was true. It is clear that representatives of two or more supplier defendants were in attendance in Chicago and New York at meetings and conferences, out of which grew the investment and requirements contracts. And the fact that copies of a memorandum of discussions held between one of the supplier defendants and one of the City Lines defendants, as well as copies of many of the letters which passed between the contracting parties prior to the execution of the contracts, were sent to representatives of other supplier defendants, coupled with the fact that the latter corresponded with one another relative to the provisions of the contracts, is hardly reconcilable with defendants' contention that

their several contracts were negotiated independently of one another but is, rather, convincing that each of the contracts was regarded by the parties as but a part of a "larger deal" or "proposition", to use the words of certain of the defendants, in which all of the supplier defendants were involved. At least the evidence submitted to the jury in this respect was clearly adequate to support its verdict. Buttressing this conclusion is the correspondence exchange between Leonard of Firestone and Riggins of Phillips, in the course of which Riggins informed Leonard that "Roy Fitzgerald advised me that General Motors and Mack Truck are going in for $500,000 each on the same basis as the rest of us" and that he understood that "Palmer got into Chicago on Wednesday and immediately *tried to get in on the deal*" (emphasis supplied) and in which Leonard said, "I have been in New York this week hob-nobbing with Roy Fitzgerald and some of the others who are interested in our proposition" and "Everything seems to be going along very nicely and I do think we will probably all benefit by the arrangement." Of the same import is the statement, in the contract of May 15, 1939, between Firestone and National City Lines, that Firestone's agreement to purchase stock is made "on the representation of National that it will secure the balance of the financing necessary for the completion of a one and a half million dollar expansion program."

Concluding, then, that the record contains the substantial evidence necessary to support a finding that defendants acted in concert rather than independently, it is necessary to determine further whether the evidence justified the jury in finding that they did so with the specific intent outlawed by the Sherman Act. In view of our conclusion that the indictment charges defendants with an offense cognizable under Section 2 of the Act, there would seem to be little doubt as to this issue, for the defendants do not deny the execution of the requirements contracts or that it was their intention to execute them, or that the effect of those contracts is to exclude competitors from selling busses, tires, tubes and petroleum products to the City

Lines defendants. Of course, it may well be that defendants did not intend affirmatively to violate the law, but it seems quite evident that they did intend, by making their mutually concerted investments in City Lines' stock conditional on the execution of exclusive requirements contracts in their favor, to join forces in making investments in consideration of the several exclusive contracts and thus, by their united and concerted action, to exclude their competitors from a market composed of the City Lines defendants and their operating subsidiaries, present and future, and, thus, that they intentionally performed acts which inevitably led to violation of Section 2 of the statute.

Defendants argue that the government's evidence discloses two separate and distinct lines of activity, one relating to transactions between the supplier defendants and National, the other encompassing the activities of the suppliers and Pacific; such evidence, they say, not only will not suffice to establish the existence of the single conspiracy charged in the indictment but constitutes a prejudicial variance. They also maintain that the evidence does not establish the existence of a common design or purpose shared by all defendants. However, the fact that one of the supplier defendants was interested only in supplying tires and tubes to both the City Lines defendants and their subsidiaries while another was concerned with only the sale of its petroleum products to the particular City Lines' companies operating in its marketing territory does not negative the existence of a common design to promote, through investments in the stock of one or both of the City Lines defendants, the acquisition by them of more and more local transit companies and, thus, to provide each of the supplier defendants with an ever-expanding market to which it would have exclusive rights as to its particular product by virtue of its requirements contracts. Nor does the circumstance that certain of the supplier defendants had requirements contracts with one but not both of the City Lines defendants absolve those defendants of participation in the conspiracy charged in the indictment or

prove that no such conspiracy existed; it was not incumbent on the government to prove that each defendant participated in that conspiracy in all of its ramifications, for, in order that one be found guilty as a conspirator, it need only be shown that, with knowledge of the existence of the conspiracy, he knowingly performed an act designed to promote or aid in the attainment of the object of that known conspiracy. Craig v. U. S., 9 Cir., 81 F.2d 816, 822, certiorari dismissed 298 U.S. 637, 56 S.Ct. 670, 80 L.Ed. 1371, certiorari denied 298 U.S. 690, 56 S.Ct. 959, 80 L.Ed. 1408; Johnson v. U. S., 9 Cir., 62 F.2d 32, 34-35; Marcante v. U. S., 10 Cir., 49 F.2d 156, 157.

### Exclusion of Testimony.

Defendants assert error upon the part of the trial court in excluding evidence offered to show (1) the motives and reasons for the actions taken by them and (2) that the business obtained from the supplier defendants for the City Lines was an insignificant portion of the market for tires, tubes and petroleum products. They insist that, though the defendant suppliers were permitted to introduce testimony as to their reasons for making the investments and entering into the supply contracts, they were unduly limited in that they were not permitted to prove customs, background and business practices in general and, that, though the amount of business transacted between suppliers and City Lines was shown, they should have been permitted to prove that it was a small part of the total commerce in such articles. Thus City Lines offered the testimony of a qualified expert to the effect that financing of customers by suppliers had long been a customary and accepted practice in American business. The supplier defendants tendered evidence to the effect that other companies frequently make investments such as they made in the City Lines. Standard offered to show that other buyers had entered into long-term exclusive contracts, that it and the oil industry in general have availed themselves of requirements contracts extensively, that, thereby, they were aided in long range planning for

production and refining, and that Standard could have sold the products delivered to City Lines to others at higher prices.

We had thought it well established that evidence of customs and practices in an industry is irrelevant in determining whether there has been an attempted monopolization. This court, in United States v. New York Great Atlantic & Pacific Tea Company, 7 Cir., 173 F.2d 79, 89, said: "That others engaged in the same practices as the defendants certainly would not exonerate the defendants or tend to disprove their guilt. Certainly trade customs and practices not shown to have been practiced in the same manner as the defendants were shown to have practiced them would not be competent to show that the defendants' practices were not illegal." We made earlier announcement of this and related rules in United States v. General Motors, 7 Cir., 121 F.2d 376, 406, where we said: "When persons conspire to impose a direct restraint on interstate commerce, benevolent motives or the activities of third parties do not save them from criminal prosecution for violation of the Sherman law. See United States v. Socony-Vacuum Oil Co., [310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129]. * * * the activities of third parties cannot justify the defendants' violation of law. See Hills Brothers v. Federal Trade Commission, 9 Cir., 9 F.2d 481, 485. * * * evidence of benevolent motives or good intention is immaterial where the operation of the conspiracy, and the specific acts and things done pursuant thereto, necessarily result in a direct restraint of interstate commerce. United States v. Patten, supra, 226 U.S. [525], 543, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325." In both of these cases we think we were fully justified in our holdings by the language of the Supreme Court in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

Obviously defendants were entitled to offer evidence as to their intent and motives and this they were permitted to do. They supplied testimony at some length as to their reasons, purposes and

motives in entering into the transactions covered by the charge and to prove that the various sales and investment contracts were for the best business interests of City Lines and their operating companies as well as those of the suppliers. Standard was allowed to present evidence as to its policy and the advantages to it of requirements contracts. Indeed, defendants admit that they were permitted to give their individual reasons for making the investment and requirements contracts but insist that they were too narrowly limited in the scope of such testimony. Standard offered evidence which the court received to the effect that it always had other places to sell its products; that it never had more products than it could sell. However, the court refused to permit the testimony to go further, saying that there should be some practical limitation to such collateral evidence.

From an examination of the record, it seems apparent to us that the court, endowed with discretion as to the amount of collateral evidence proper, did not abuse its discretion. This is in line with what the Supreme Court said in United States v. Socony-Vacuum Oil Co., 310 U.S. 150 at 230, 60 S.Ct. 811 at 847, 84 L.Ed. 1129: "While the offer was not wholly irrelevant to the issues, it was clearly collateral. The trial court has a wide range for discretion in the exclusion of such evidence. See Golden Reward Mining Co. v. Buxton Mining Co., 8 Cir., 97 F. 413, 416, 417; Chesterfield Mfg. Co. v. Leota Cotton Mills, 8 Cir., 194 F. 358, 359. Admission of testimony showing the market conditions late in 1934 would have opened an inquiry into causal factors as involved and interrelated as those present during the indictment period. That might have confused rather than enlightened the jury. In any event it would not have eliminated the buying programs as contributory causes to the market rise and stability in 1935 and 1936. And it would have prolonged the inquiry and protracted the trial. As once stated by Mr. Justice Holmes, one objection to the introduction of collateral issues is a 'purely practical one—a concession to the shortness of life.' Reeve v. Dennett, 145 Mass. 23, 28, 11 N.E. 938, 944. And see Union Stock Yard & Transit Co. v. United States, 308 U.S. 213, 223, 224, 60 S.Ct. 193, 197, 198, 84 L.Ed. 198. * * * In conclusion, we do not think that there was an abuse of discretion by the trial court in the exclusion of the proffered evidence." The jury's inquiry was not one as to customs or practices or as to what others had done on other times and occasions. The question before the jury was whether what defendants had done amounted to violation of law as charged. The mere fact, if it be a fact, that other suppliers had followed a similar course of conduct by doing what defendants are charged with doing, would in no wise excuse defendants for their acts if those acts were illegal.

That the evidence offered by defendants comparing their total sales to City Lines and their companies and their total sales in the national market was not erroneously excluded is shown by our earlier quotation from the Yellow Cab case, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010. In other words, it was not incumbent upon the government to show that a certain stated percentage of the total commerce was involved in this particular cause. We think the jury could not properly have found other than that the sales of all tires, busses and petroleum products to 46 operating companies in 45 states, aggregating many millions of dollars, constituted a substantial segment of interstate commerce and that evidence comparing this with the amount involved in the total business of the companies was wholly irrelevant. It was not a question of what percentage of the total commerce in such products was but a question of whether a substantial part of commerce was monopolized.

We have considered carefully all the evidence offered and excluded. We think that the court's rulings were fair, and that, having permitted great latitude in admitting testimony as to intent, purpose and reasons for the making of the contracts, the court, in its discretion, was entirely justified in excluding the additional testimony offered.

We believe that what we have said sufficiently disposes of all contentions

of defendants without further extension of this opinion. Inasmuch as the charge was sufficient at law, the evidence substantial and adequate and the trial without error, as a court of review, we may not properly interfere.

The judgment is affirmed.